<table>
<tr><td>

**DISTRICT COURT, COUNTY OF EL PASO, COLORADO**
P.O. Box 2980
270 S. Tejon Street
Colorado Springs, CO 80903
Phone: (719) 452-5000

</td><td>

DATE FILED: September 18, 2020 9:20 AM
FILING ID: B4129BAF27466
CASE NUMBER: 2020CV31700

</td></tr>
<tr><td>

**David Lanford,**

      **Plaintiff,**

**vs.**

**University of Colorado, through its Board, the Regents of the University of Colorado, a body corporate,**

      **Defendant.**

</td><td>

_____
Case Number:


Division:

</td></tr>
<tr><td>

Ian D. Kalmanowitz, # 32379
CORNISH & DELL'OLIO, P.C.
431 N. Cascade Avenue, Suite 1
Colorado Springs, CO 80903
Phone: (719) 475-1204
Fax: (719) 475-1264
Email: ikalmanowitz@cornishanddellolio.com

</td><td></td></tr>
<tr><td colspan="2" align="center">

**Complaint**

</td></tr>
</table>

COMES NOW Plaintiff David Lanford and for his Complaint against the Defendant, alleges as follows:

### Introduction

1. Plaintiff David Lanford was formerly employed as a police officer at the University of Colorado Colorado Springs. After suffering a disabling on-the-job injury, Defendant failed to accommodate Mr. Lanford's disability and terminated his employment. Plaintiff brings this action against his former employer, the University of Colorado Colorado Springs, through its Board, the Regents of the University of Colorado, seeking reinstatement and damages to redress violations of the Colorado Anti-Discrimination Act, C.R.S. § 24-34-401, *et*

1

*seq.* and Section 504 of the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 701, *et seq.*

## Jurisdiction

2.     Jurisdiction is conferred by Article VI, Section 9 of the Colorado Constitution.

## Parties

3.     David Lanford is a natural person who resides in Rio Grande County, Colorado. At all times relevant to this Complaint, Plaintiff was a resident of El Paso County, Colorado.

4.     The Regents of the University of Colorado is a body corporate created by Article IX, Section 12 of the Colorado Constitution which exists to govern the University of Colorado.

5.     The University of Colorado is a state institution of higher education created pursuant to Article VIII, Section 5 of the Colorado Constitution.

6.     The University of Colorado Colorado Springs is a campus of the University of Colorado located in El Paso County, Colorado.

## Exhaustion of Administrative Remedies

7.     Plaintiff exhausted his administrative remedies under the Colorado Anti-Discrimination Act.

8.     Plaintiff filed a Charge of Discrimination with the Colorado Civil Rights Division ("CCRD") on August 26, 2019.

9.     Defendant filed a position statement with the CCRD on November 5, 2019 responding to the allegations in Plaintiff's Charge of Discrimination.

10.     The CCRD emailed Plaintiff a Determination and Notice of Right to Sue on June 22, 2020.

11.     In its Determination and Notice of Right to Sue, the CCRD determined that it had jurisdiction over Plaintiff's Charge of Discrimination.

12.     Plaintiff filed this Complaint within 90 days of the date of mailing of the

Determination and Notice of Right to Sue.

13.     Plaintiff is not required to exhaust his Section 504 claims.

**General Allegations**

14.     All of the allegations giving rise to this Complaint occurred in El Paso County,

Colorado.

15.     David Lanford was formerly employed as a police officer in the Department of

Public Safety at the University of Colorado Colorado Springs.

16.     The University of Colorado Colorado Springs ("UCCS") is a campus of the

University of Colorado system located in Colorado Springs.

17.     UCCS receives federal financial assistance.

18.     On its website, UCCS touts that: "In accordance with federal and state laws,

including but not limited to the Rehabilitation Act of 1973, the Americans with Disabilities Act

of 1990 (ADA) and the ADA Amendments Act of 2008 (ADAAA), the University prohibits

discrimination based on disability in the application process, employment relationship, programs,

services, and activities."

19.     The Department of Public Safety at UCCS operates as a police department on the

UCCS campus.

20.     Police officers employed by the UCCS Department of Public Safety are granted

all the powers conferred by law upon peace officers to carry weapons and make arrests while on

the UCCS campus.

21.     On August 19, 2014, UCCS hired Mr. Lanford to work as a police officer.

22.     Mr. Lanford's started working for UCCS on September 1, 2014.

3

23.     Mr. Lanford was an experienced law enforcement officer at the time he went to work for UCCS.

24.     Mr. Lanford was a Colorado P.O.S.T. certified law enforcement officer throughout his employment with UCCS.

25.     Mr. Lanford's experience in law enforcement includes working as a deputy sheriff for the El Paso County Sheriff's Office, a public safety officer for Front Range Community College, a detentions captain for the Kit Carson County Sheriff's Office, and a police officer for the Colorado Mental Health Institute at Pueblo.

26.     Throughout Mr. Lanford's employment with UCCS he met all the minimum qualifications for his position.

27.     In every annual evaluation Mr. Lanford received during his employment, his performance was rated as "meeting expectations."

28.     Mr. Lanford's final performance evaluation, dated February 27, 2019, indicates that his performance was "meeting expectations."

29.     Throughout Mr. Lanford's employment, he satisfactorily performed the duties of his position.

30.     On November 27, 2017, Mr. Lanford was involved in a motor vehicle accident while at work.

31.     While Mr. Lanford was in his patrol car performing traffic control duties, a careless driver crashed into the rear of his patrol car, totaling the car and injuring Mr. Lanford.

32.     Mr. Lanford suffered significant injuries as a result of the car accident.

33.     The injuries Mr. Lanford sustained cause him to suffer severe headaches, ringing in his ears, and impacted his cognitive abilities and depth perception.

34.     Mr. Lanford suffered headaches, ringing in his ears, and impacts to cognition and depth perception for a duration lasting longer than six months from the date of the accident.

35.     As of the filing of this lawsuit, Mr. Lanford still suffers some symptoms related to the injuries he sustained in the car accident.

36.     Mr. Lanford's diminished depth perception impacts his vision and ability to see.

37.     When Mr. Lanford suffers from severe headaches or ringing in his ears, he withdraws from the activities he is pursuing and remains in a quiet location until the headaches or ringing in his ears subside to a level at which he can resume normal activities.

38.     When Mr. Lanford suffers from severe headaches or ringing in his ears, he is limited in his ability to concentrate, focus on, or think about normal tasks.

39.     Mr. Lanford's diminished cognitive abilities impact his memory and ability to process information.

40.     The headaches, ringing in his ears, diminished cognitive abilities and depth perception substantially limited Mr. Lanford in the major life activities of thinking and seeing.

41.     The headaches, ringing in his ears, diminished cognitive abilities and depth perception substantially limited Mr. Lanford's brain and neurologic bodily functions.

42.     The injuries that Mr. Lanford sustained, and the symptoms caused by those injuries, limited Mr. Lanford's ability to work as a police officer.

43.     As a result of the injuries that Mr. Lanford sustained, and the symptoms caused by those injuries, Mr. Lanford's medical provider restricted him from performing many of the normal duties of a police officer.

44.     After the date of the accident, Mr. Lanford was off work for fourteen days.

45.     Mr. Lanford's immediate supervisor, Jerrod Heidrick, was aware of the injuries

that Mr. Lanford sustained, the symptoms caused by those injuries, Mr. Lanford's medical condition, and the limitations caused by his medical condition.

46.     Mr. Lanford's entire chain of command was aware of the injuries that he sustained, the symptoms caused by those injuries, Mr. Lanford's medical condition, and the limitations caused by his medical condition.

47.     Mr. Heidrick and other members of Mr. Lanford's chain of command routinely communicated with members of UCCS's risk management and human resources staff about Mr. Lanford's medical condition, the limitations caused by his medical condition, and his work restrictions.

48.     Mr. Lanford returned to work in December 2017 under medical restrictions that prevented him from performing some of the normal duties of a police officer.

49.     On February 9, 2018, a workers compensation doctor released Mr. Lanford to return to work for part-time modified duty of ten hours every other day and not more than two days per week.

50.     The February 9, 2018 work restrictions included the restriction that Mr. Lanford perform "sedentary-desk type work only."

51.     On February 21, 2018, Mr. Lanford's doctor recommended that Mr. Lanford work no more than four hours per day in a desk job and be allowed frequent breaks.

52.     From February 22 to June 5, 2018, Mr. Lanford was assigned to work a light duty position for fours per day working at a desk with a computer.

53.     From the time Mr. Lanford was assigned the part-time desk job working with a computer on February 22, 2018 until June 5, 2018, he repeatedly took time off from work because the work with the computer caused him to suffer headaches.

54.     Mr. Heidrick was aware that Mr. Lanford's work with a computer was exacerbating the symptoms of his injuries and causing him to suffer headaches.

55.     Mr. Heidrick was aware that Mr. Lanford was repeatedly missing work due to headaches caused by working with computers.

56.     On March 22, 2018, Mr. Lanford called Mr. Heidrick to inform him that Mr. Lanford's doctor had released him to return to work for six hours in uniform while working with another officer.

57.     UCCS did not permit Mr. Lanford to return to work for six hours in uniform while working with another officer.

58.     Mr. Heidrick reported to UCCS's workers compensation claims examiner, Tiara Lewis, that the department was not comfortable with having Mr. Lanford return to work in uniform as the department had concerns about safety if Mr. Lanford was not 100% able to perform the duties of a police officer.

59.     After March 22, 2018, UCCS kept Mr. Lanford working in the same part-time desk job working with a computer that he had been assigned on February 22, 2108.

60.     Mr. Lanford continued to miss work after March 22, 2018 because of the headaches he suffered from working with computers.

61.     On April 13, 2018, Mr. Lanford gave Mr. Heidrick a note from his doctor stating that Mr. Lanford needed to remain on light duty for another month.

62.     Mr. Heidrick contacted Ms. Lewis to inform her he received the note from Mr. Lanford on April 13, 2018.

63.     Ms. Lewis responded to Mr. Heidrick by email on April 17, 2018 and informed him that she had spoken with UCCS's ADA Coordinator about Mr. Lanford during the prior

7

week.

64.     UCCS's ADA Coordinator is the staff person who functions as the central point of contact to receive all requests for reasonable accommodation and to receive all documentation required to determine disability status for faculty, staff and student employees at UCCS.

65.     UCCS's ADA Coordinator also interprets and applies federal and state laws regarding equal access for faculty, staff, students, and visitors with disabilities, monitors and ensures compliance, and develops and implements internal measures and/or reports which inform the University administration of the status of ADA compliance and opportunities for people with disabilities.

66.     Upon information and belief, Ms. Lewis spoke with UCCS's ADA Coordinator during April 2018 for purposes of discussing Mr. Lanford's disability status or reasonable accommodations for his disability.

67.     Mr. Lanford was never contacted by the ADA Coordinator.

68.     Mr. Lanford continued to miss work after April 13, 2018 because of the headaches he suffered from working with computers.

69.     By early June 2018, Mr. Lanford was suffering headaches after working with computers with such frequency that he was no longer able to continue working the part-time desk job position he had been assigned on February 22, 2018.

70.     Mr. Lanford was never able to work a full shift in part-time desk job position because of how that work exacerbated his headaches.

71.     Mr. Heidrick was aware that Mr. Lanford could not work a full shift in the part-time desk job position because of the impact that work had on Mr. Lanford's injuries and symptoms.

8

72.     Despite Mr. Heidrick's knowledge of Mr. Lanford's inability to work in the part-time desk job position, Mr. Heidrick never discussed that assignment with Mr. Lanford or proposed alternatives to Mr. Lanford.

73.     Throughout the period of Mr. Lanford's incapacity to work at full duty as a police officer for UCCS, he desired to continue working for UCCS in some capacity.

74.     At various times from the start of Mr. Lanford's light duty through early June 2018, Mr. Lanford informed Mr. Heidrick of his desire to return to work at UCCS in a regular capacity.

75.     On June 5, 2018, Mr. Lanford sent an email to Mr. Heidrick that stated: "I'm so tired of not being back to work."

76.     The context of Mr. Lanford's June 5, 2018 email indicated his desire to return to work at UCCS.

77.     On June 8, 2018, Mr. Lanford sent an email to Mr. Heidrick that stated: "I need to come back."

78.     Mr. Lanford's June 8, 2018 email unambiguously indicated his desire to return to work at UCCS.

79.     At the time Mr. Heidrick received Mr. Lanford's June 5 and June 8 emails indicating Mr. Lanford's desire to return to work, Mr. Heidrick was aware that Mr. Lanford could not perform the part-time desk job without it exacerbating the symptoms of his injuries.

80.     Mr. Heidrick did not respond to Mr. Lanford's June 8, 2018 email.

81.     Despite Mr. Lanford's repeated expression of his desire to return to work, UCCS did nothing to help bring him back to work.

82.     At the time Mr. Lanford sent his June 8, 2018 email to Mr. Heidrick that stated: "I

9

need to come back," UCCS was on notice that Mr. Lanford required a reasonable accommodation.

83.     For at least three months before Mr. Lanford sent the June 8, 2018 email to Mr. Heidrick, UCCS was on notice of Mr. Lanford's need for a reasonable accommodation.

84.     Instead of working with Mr. Lanford to find a reasonable accommodation that would enable him to work in any position, UCCS set about planning to terminate Mr. Lanford's employment.

85.     On June 28, 2018, Mr. Heidrick sent an email to Ms. Lewis asking about Mr. Lanford: "what is the date by with which we can act on his employment?"

86.     Mr. Heidrick's question about the date that UCCS could "act on his employment" was a question about the date on which UCCS could terminate Mr. Lanford.

87.     On August 7, 2018, Mr. Heidrick sent an email to Anja Wynne, UCCS's Director of Human Resources and ADA Coordinator containing a timeline of Mr. Lanford's "worker's comp activities."

88.     The timeline contained in Mr. Heidrick's August 7, 2018 email contains information about Mr. Lanford's attempts to return to work, his limitations on working, and information about Mr. Lanford's inability to work in the part-time desk job.

89.     The timeline created by Mr. Heidrick indicates that Mr. Heidrick was aware that Mr. Lanford could not perform the part-time desk job without it exacerbating the symptoms of his injuries.

90.     The information about Mr. Lanford's inability to successfully work in the part-time desk job that is contained in Mr. Heidrick's timeline shows that Mr. Heidrick was on notice of Mr. Lanford's disability and need for a reasonable accommodation as of the day he wrote the

timeline.

91.    The information about Mr. Lanford's inability to successfully work in the part-time desk job that is contained in Mr. Heidrick's timeline was sufficient to put Ms. Wynne on notice of Mr. Lanford's disability and need for a reasonable accommodation as of the day she read the timeline.

92.    After Ms. Wynne, UCCS's ADA Coordinator, received Mr. Heidrick's timeline, she commented that it "is very helpful" and had no further comment about Mr. Lanford's employment situation.

93.    If Ms. Wynne had not known of Mr. Lanford's difficulties at work and his inability to work in the part-time desk job without suffering headaches prior to August 7, 2018, she was on notice of Mr. Lanford's need for a reasonable accommodation after she received Mr. Heidrick's email containing the timeline.

94.    Other than responding to Mr. Heidrick to tell him that his timeline was "very helpful," Ms. Wynne took no action concerning Mr. Lanford's disability or his evident need for a reasonable accommodation.

95.    On August 21, 2018, the department's Deputy Chief, Clay Garner, sent an email that stated the following:

> Hi All,
>
> Can we meet again to discuss Dave Lanford's status?  I have some concerns about what is not being considered in his case.  I'm being informed that to perform an administrative discharge of Lanford we have to exhaust his leave.  Since he has or will have used up all of his sick leave in the near future is there no way we can pay out his vacation leave and then discharge him?  We could project his vacation accrual based on when he would have out of that if it is an issue.  There's nothing that I've read that dictated how he works through his leave for this to apply.
>
> Also, it feels like we're being penalized for being compassionate with Lanford by repeatedly trying to find light duty for him throughout this nine month period

11

thereby saving him the loss of sick leave and/or vacation time.  Is there no way to take into account how flexible we've been throughout this process?  We cannot afford to wait another 5 to 6 months to replace his position.  We are a small department and staffing is always going to be a mission critical concern for us.  Is there nothing that can be done here?

Regards,
Clay

96.    The statements in Mr. Garner's August 21, 2018 email indicate that Mr. Lanford's chain of command was aware of Mr. Lanford's disability and need for a reasonable accommodation.

97.    Mr. Garner's August 21, 2018 email clearly indicates that it would be preferable to terminate Mr. Lanford's employment rather than to provide him with a reasonable accommodation.

98.    Mr. Garner's email proposes that UCCS should terminate Mr. Lanford and pay out Mr. Lanford's remaining balance of accrued leave rather than provide Mr. Lanford with a reasonable accommodation.

99.    Although Mr. Garner's email states that UCCS had "repeatedly" tried to find light duty for Mr. Lanford over a nine-month period, that statement is incorrect.

100.    Other than assigning Mr. Lanford a part-time desk job, UCCS did nothing to find any other position for Mr. Lanford.

101.    For months after assigning Mr. Lanford the part-time desk job, UCCS was aware that the computer use required by that position was exacerbating Mr. Lanford's headaches and causing him to miss work.

102.    Despite UCCS's knowledge that Mr. Lanford could not perform the part-time desk job without suffering increased headaches and missing work, UCCS took no action to find another position for Mr. Lanford.

103.    Mr. Garner's email also overstated any concern about the need to fill Mr. Lanford's position.

104.    As of November 5, 2019, over fourteen months after Mr. Garner wrote his email, and over eight months after Mr. Lanford's employment was terminated, UCCS had not filled Mr. Lanford's positions.

105.    None of the individuals who received Mr. Garner's email suggested that UCCS attempt to find another position for Mr. Lanford.

106.    Anja Wynne, the ADA Coordinator, received Mr. Garner's August 21, 2018 email.

107.    The statements in Mr. Garner's email once again put Ms. Wynne on notice of Mr. Lanford's disability and need for reasonable accommodation.

108.    Ms. Wynne responded to Mr. Garner's email, but her response did not mention the possibility of looking for a reasonable accommodation for Mr. Lanford.

109.    On August 22, 2018, Anja Wynne responded to Mr. Garner's email and confirmed that under State Personnel Board Rule 5-6, Exhaustion of Leave & Administrative Discharge, Mr. Lanford could not be terminated until he used all accrued paid leave.

110.    While State Personnel Board Rule 5-6 does permit the discharge of employees who have used all accrued leave, the Rule does not permit the discharge for exhaustion of leave if the employee is a qualified individual with a disability under the ADA who can reasonably be accommodated without undue hardship.

111.    Ms. Wynne's August 22, 2018 email about using Rule 5-6 to terminate Mr. Lanford did not mention the Rule's proscription on discharging employees with disabilities who can be accommodated.

13

112.    After the August 22, 2018 email was sent, UCCS took no steps to accommodate Mr. Lanford.

113.    On November 27, 2018, Mr. Heidrick and Ms. Lewis exchanged emails about Mr. Lanford and when he would potentially be determined to be at maximum medical improvement ("MMI").

114.    Mr. Heidrick asked Ms. Lewis if she thought the decision to place Mr. Lanford at MMI "will stretch until February, that is when he runs out of time and we can separate."

115.    Mr. Heidrick's reference to Mr. Lanford running out of time was a reference to the requirement under State Personnel Board Rule 5-6 that an employee exhaust all accrued leave before being terminated.

116.    At the time Mr. Heidrick sent the email on November 27, 2018, UCCS desired to terminate Mr. Lanford's employment and was planning for that termination.

117.    On January 23, 2019, Ms. Lewis left a voicemail message for Mr. Heidrick in which she stated that Mr. Lanford's restrictions had not changed and that there was a question about whether Mr. Lanford would be able to return to his job.

118.    Ms. Lewis also stated that it was time for UCCS to look into how much sick and vacation time Mr. Lanford had left so they could calculate it "down to the moment."

119.    Ms. Lewis' reference to calculating Mr. Lanford's remaining sick and vacation time "down to the moment" was a reference to determining the time at which Mr. Lanford could be terminated for having exhausted his accrued leave.

120.    On February 28, 2019, Mr. Lanford exhausted all accrued sick and annual leave.

121.    On February 28, 2019, UCCS terminated Mr. Lanford's employment.

122.    From the time Mr. Lanford returned to work in December 2017 following his

14

injury through the date of his termination, UCCS was aware of Mr. Lanford's disabilities and his need for an accommodation.

123.    UCCS was also aware of Mr. Lanford's desire to continue working.

124.    Despite UCCS's awareness of Mr. Lanford's disabilities, his need for an accommodation, and his desire to continue working, UCCS never engaged in an interactive process with Mr. Lanford to identify any possible reasonable accommodations for his disability.

125.    As Mr. Lanford was unable to work as a police officer and UCCS knew that he wished to continue working, it would have been reasonable for UCCS to reassign Mr. Lanford to a vacant position at UCCS as a reasonable accommodation for his disability.

126.    Although the injuries that Mr. Lanford suffered, and the medical conditions caused by those injuries, prevented him from working as a police officer, Mr. Lanford's medical conditions did not prevent or limit him from performing the essential functions of other jobs at UCCS with or without a reasonable accommodation.

127.    Between February 9, 2018 and February 27, 2019, there were at least 388 vacant positions at UCCS.

128.    In the month following Mr. Lanford's termination, there were at least another 35 vacant positions at UCCS.

129.    In addition to the over 400 vacant positions at UCCS from February 9, 2018 through March 29, 2019, there were a number of vacant positions throughout the campus that were generally filled by students on a part-time basis in a work-study capacity.

130.    Among the over 400 vacant positions plus the work-study positions, there were a number of vacancies for which Mr. Lanford was qualified to perform the essential functions of the position with or without a reasonable accommodation.

15

131.    No representative of UCCS ever discussed the possibility of reassignment with Mr. Lanford.

132.    No representative of UCCS ever discussed any potential reasonable accommodations with Mr. Lanford.

133.    No representative of UCCS ever engaged in any interactive process with Mr. Lanford.

134.    If UCCS had engaged in an interactive process with Mr. Lanford, available reasonable accommodations, including reassignment would have been identified.

135.    Other potential accommodations that could have been identified include modified duty in the police department that did not involve use of a computer, or determining if any devices or assistive aids, such as screen filters or different lights, could have enabled Mr. Lanford to perform the part-time desk job without headaches.

136.    UCCS's failure to accommodate Mr. Lanford's disability resulted in the termination of Mr. Lanford's employment.

137.    UCCS engaged in a deliberate plan to terminate Mr. Lanford's employment because of his disability.

138.    UCCS was aware that Mr. Lanford was using his available sick and annual leave to cover absences from the part-time desk job that exacerbated the symptoms of his injuries.

139.    Rather than attempt to accommodate Mr. Lanford by reassigning him to a position that did not cause him to suffer from headaches that rendered him unable to work, UCCS kept Mr. Lanford in the part-time desk job.

140.    For more than eight months, UCCS tracked Mr. Lanford's leave usage and accrual with the goal of being able to terminate his employment as soon as he ran out of accrued

leave.

141.    As soon as Mr. Lanford ran out of accrued leave on February 28, 2019, his employment was terminated.

142.    UCCS claimed that Mr. Lanford's termination was justified under State Personnel Board Rule 5-6.

143.    Prior to invoking Rule 5-6 as the basis for Mr. Lanford's termination, UCCS failed to determine if Mr. Lanford could have been provided with a reasonable accommodation.

144.    Mr. Lanford's employment with UCCS was terminated because of his disability.

145.    Mr. Lanford's employment with UCCS was terminated because he was regarded as having a disability, or because he had a record of having a disability.

### First Cause of Action
### (Rehabilitation Act - Failure to Accommodate)

146.    Plaintiff realleges all prior paragraphs and incorporates them herein.

147.    Defendant receives federal financial assistance.

148.    Defendant is subject to the provisions of the Rehabilitation Act of 1973.

149.    Plaintiff is a qualified individual with a disability, specifically severe headaches, ringing in his ears, and impacted cognitive abilities and depth perception.

150.    Plaintiff's severe headaches, ringing in his ears, and impacted cognitive abilities and depth perception substantially limited him in the major life activities of thinking and seeing.

151.    Plaintiff's severe headaches, ringing in his ears, and impacted cognitive abilities and depth perception substantially limited his brain and neurologic major bodily functions.

152.    Plaintiff was qualified for his position.

153.    Plaintiff was qualified for numerous vacant positions at UCCS.

154.    Plaintiff was able to perform the essential functions of his job with or without

17

reasonable accommodation.

155.    Plaintiff was able to perform the essential functions of numerous vacant positions at UCCS with or without reasonable accommodation.

156.    Plaintiff requested a reasonable accommodation, or alternatively, Defendant was aware of Plaintiff's need for a reasonable accommodation.

157.    Defendant failed to engage in the interactive process with Plaintiff regarding any potential reasonable accommodations.

158.    Defendant failed to provide Plaintiff with a reasonable accommodation at any time after his request for a reasonable accommodation or after Defendant was aware of Plaintiff's need for a reasonable accommodation.

159.    There were reasonable accommodations available to Plaintiff that Defendant could have provided, including reassignment to a vacant position, modified duty, or assistive aids, among others.

160.    Plaintiff's employment was terminated because Defendant failed to provide him with a reasonable accommodation.

161.    Defendant's acts and omissions violated Plaintiff's rights under the Rehabilitation Act.

162.    Defendant acted with malice and with reckless disregard for Plaintiff's federally protected right to reasonable accommodations in the workplace.

163.    As a result of Defendant's discriminatory conduct, Plaintiff has suffered damages, including lost wages and compensatory damages, and has incurred attorneys' fees and costs.

### Second Cause of Action
### (Rehabilitation Act – Discriminatory Termination of Employment)

164.    Plaintiff realleges all prior paragraphs and incorporates them herein.

165.    Defendant knew that Plaintiff suffered from disabilities: severe headaches, ringing in his ears, and impacted cognitive abilities and depth perception.

166.    Defendant knew that Plaintiff's disabilities caused difficulties with thinking and seeing and limited Plaintiff's brain and neurologic bodily functions.

167.    Defendant regarded Plaintiff as having a disability.

168.    Defendant knew that Plaintiff had a record of a disability.

169.    Defendant terminated Plaintiff's employment on February 28, 2019 because of Plaintiff's disability, because it regarded Plaintiff as having a disability, or because Plaintiff had a record of having a disability.

170.    Defendant's acts and omissions violated Plaintiff's rights under the Rehabilitation Act.

171.    Defendant acted with malice and with reckless disregard for Plaintiff's federally protected right not to be terminated because of his status as a qualified individual with a disability.

172.    As a result of Defendant's discriminatory conduct, Plaintiff has suffered damages, including lost wages and compensatory damages, and has incurred attorneys' fees and costs.

**Third Cause of Action**
**(Colorado Anti-Discrimination Act—Failure to Accommodate)**

173.    Plaintiff realleges all prior paragraphs and incorporates them herein.

174.    Plaintiff exhausted his administrative remedies under the Colorado Anti-Discrimination Act.

175.    Plaintiff is a qualified individual with a disability, specifically severe headaches, ringing in his ears, and impacted cognitive abilities and depth perception.

176.    Plaintiff's severe headaches, ringing in his ears, and impacted cognitive abilities

19

and depth perception substantially limited him in the major life activities of thinking and seeing.

177.    Plaintiff's severe headaches, ringing in his ears, and impacted cognitive abilities and depth perception substantially limited his brain and neurologic major bodily functions.

178.    Plaintiff was qualified for his position.

179.    Plaintiff was qualified for numerous vacant positions at UCCS.

180.    Plaintiff was able to perform the essential functions of his job with or without reasonable accommodation.

181.    Plaintiff was able to perform the essential functions of numerous vacant positions at UCCS with or without reasonable accommodation.

182.    Plaintiff requested a reasonable accommodation, or alternatively, Defendant was aware of Plaintiff's need for a reasonable accommodation.

183.    Defendant failed to engage in the interactive process with Plaintiff regarding any potential reasonable accommodations.

184.    Defendant failed to provide Plaintiff with a reasonable accommodation at any time after his request for a reasonable accommodation or after Defendant was aware of Plaintiff's need for a reasonable accommodation.

185.    There were reasonable accommodations available to Plaintiff that Defendant could have provided, including reassignment to a vacant position, modified duty, or assistive aids, among others.

186.    Plaintiff's employment was terminated because Defendant failed to provide him with a reasonable accommodation.

187.    Defendant's acts and omissions violated Plaintiff's rights under the Colorado Anti-Discrimination Act.

20

188.    Defendant acted with malice and with reckless disregard for Plaintiff's protected right to reasonable accommodations in the workplace.

189.    As a result of Defendant's discriminatory conduct, Plaintiff has suffered damages, including lost wages and compensatory damages, and has incurred attorneys' fees and costs

**Fourth Cause of Action**
**(Colorado Anti-Discrimination Act—Discriminatory Termination of Employment)**

190.    Plaintiff realleges all prior paragraphs and incorporates them herein.

191.    Plaintiff exhausted his administrative remedies under the Colorado Anti-Discrimination Act.

192.    Defendant knew that Plaintiff suffered from disabilities: severe headaches, ringing in his ears, and impacted cognitive abilities and depth perception.

193.    Defendant knew that Plaintiff's disabilities caused difficulties with thinking and seeing and limited Plaintiff's brain and neurologic bodily functions.

194.    Defendant regarded Plaintiff as having a disability.

195.    Defendant knew that Plaintiff had a record of a disability.

196.    Defendant terminated Plaintiff's employment on February 28, 2019 because of Plaintiff's disability, because it regarded Plaintiff as having a disability, or because Plaintiff had a record of having a disability.

197.    Defendant's acts and omissions violated Plaintiff's rights under the Colorado Anti-Discrimination Act.

198.    Defendant acted with malice and with reckless disregard for Plaintiff's protected right not to be terminated because of his status as a qualified individual with a disability.

199.    As a result of Defendant's discriminatory conduct, Plaintiff has suffered damages, including lost wages and compensatory damages, and has incurred attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.        A declaration that Defendant discriminated against Plaintiff in violation of the, the

Rehabilitation Act and the Colorado Anti-Discrimination Act;

2.        Backpay in amount equal to lost compensation and benefits;

3.        Damages for all other monetary losses sustained as a direct result of the

violations;

4.        Non-pecuniary and compensatory damages, including damages for humiliation,

emotional distress, and consequential damages;

5.        Reinstatement or front pay in lieu thereof;

6.        Nominal damages;

7.        Pre- and post- judgment interest at the highest statutory rate;

8.        Costs and attorney's fees; and

9.        All other legal or equitable relief the court deems appropriate.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial for all issues triable by jury.

Respectfully submitted this 18th day of September, 2020.


CORNISH & DELL'OLIO, P.C.


s/Ian D. Kalmanowitz
Ian D. Kalmanowitz, # 32379
CORNISH & DELL'OLIO, P.C.
431 N. Cascade Avenue, Suite 1
Colorado Springs, CO 80903
Phone: (719) 475-1204
Fax: (719) 475-1264
Email:  ikalmanowitz@cornishanddellolio.com

Attorneys for Plaintiff

Plaintiff's Address:
505 Davis Street
Monte Vista, CO 81144