IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03120

David Lanford,

      Plaintiff,

v.

University of Colorado, through its Board,
the Regents of the University of Colorado,
a bodycorporate

      Defendant.

---

## SCHEDULING ORDER

---

### 1. DATE OF CONFERENCE
### AND APPEARANCES OF COUNSEL AND PRO SE PARTIES

Due to the ongoing COVID-19 (Coronavirus Disease) outbreak, a Scheduling Conference was not

set by the Court. The parties jointly prepared a Scheduling Order for submission to the Court. The

Plaintiff was represented by Ian Kalmanowitz of Cornish & Dell'Olio, P.C. and the Defendant was

represented by Erica Weston of University of Colorado, Office of University Counsel.

### 2. STATEMENT OF JURISDICTION

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §

1343(a)(3) and (a)(4), which grant original jurisdiction to the federal District Court in actions

arising under federal civil rights laws. By virtue of the Court's original jurisdiction over Mr.

Lanford's Rehabilitation Act claims, this Court has supplemental jurisdiction over his state law

1

claim pursuant to 28 U.S.C. § 1367.

### 3. STATEMENT OF CLAIMS AND DEFENSES

*a.* Plaintiffs: This is an employment discrimination action brought by Plaintiff David Lanford against Defendant University of Colorado ("the University" or "UCCS"). In particular, Mr. Lanford alleges that the University failed to accommodate his disabilities and terminated his employment because of his disabilities in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* and the Colorado Anti-Discrimination Act, C.R.S. § 24-34-401, *et seq.*

Mr. Lanford was employed by the University as a police officer from September 1, 2014 until his employment was terminated on February 28, 2019. Mr. Lanford spent years working in law enforcement before his employment with the University, and he maintained a valid P.O.S.T. certification while employed. Throughout his employment, Mr. Lanford's performance was rated as "meeting expectations."

While at work on November 27, 2017, a careless driver crashed into Mr. Lanford's patrol car, causing him significant injuries. The injuries Mr. Lanford sustained cause him to suffer severe headaches, ringing in his ears, and impacted his cognitive abilities and depth perception. The injuries, and their symptoms, impact Mr. Lanford's: vision and ability to see; his ability to concentrate, focus on, or think about normal tasks; and his memory and ability to process information. The headaches, ringing in his ears, diminished cognitive abilities and depth perception substantially limited Mr. Lanford in the major life activities of thinking and seeing and his brain and neurologic major bodily functions, and are disabilities within the meaning of the Rehabilitation Act and the Colorado Anti-Discrimination Act.

Mr. Lanford's disabilities made him unable to perform the essential functions of his position as a police officer; however, Mr. Lanford desired to remain employed by the University. After the accident, Mr. Lanford was assigned a light-duty position working at a desk using a computer, but the use of the computer exacerbated Mr. Lanford's symptoms to such an extent that he could not work a full shift in that light duty position. As a result, by June 2018 Mr. Lanford could no longer work in the light duty position and began using his accrued leave. Mr. Lanford's supervisor, Jerrod Heidrick was aware of Mr. Lanford's limitations, his need for an accommodation, and his inability to successfully work in the light duty position. Mr. Heidrick shared information about Mr. Lanford's limitations with the UCCS Police Department chain of command, with UCCS's workers compensation claims adjuster, and with UCCS's ADA Coordinator, putting all of those individuals on notice of Mr. Lanford's need for reasonable accommodations. At no time did the University engage in any form of an interactive process with Mr. Lanford to identify reasonable accommodations, including transfers to vacant positions, that would have enabled him to continue working.

Rather than working with Mr. Lanford to identify potential reasonable accommodations for his disabilities, the University determined it would terminate Mr. Lanford's employment. Mr. Lanford's chain of command, including Mr. Heidrick and the Deputy Police Chief, along with the ADA Coordinator and workers compensation claims adjuster, monitored Mr. Lanford's use of leave in order to determine the precise moment when he would use all accrued leave so he could be terminated. In August 2018, before Mr. Lanford has used all his accrued leave, the Deputy Police Chief claimed that it was necessary to fill Mr. Lanford's position, and proposed

terminating Mr. Lanford and paying out whatever accrued leave was remaining. Communications about terminating Mr. Lanford upon the expiration of his accrued leave continued through February 2019. On February 28, 2019, Mr. Lanford exhausted all accrued leave and was terminated. Despite the Deputy Chief's claim in August 2018 that it was critical to fill Mr. Lanford's position, that position remained vacant for over fourteen months, if not longer.

Mr. Lanford claims that he is a qualified individual with a disability, that the University failed to accommodate his disability, and terminated his employment because of his disability. Mr. Lanford has suffered damages because of the disparate treatment and discrimination he was subjected to in violation of the Rehabilitation Act and the Colorado Anti-Discrimination Act.

b. Defendants: The University did not discriminate against or fail to accommodate Mr. Lanford. Mr. Lanford did not request a reasonable accommodation, or even respond to the University's outreach in December 2018 and January 2019 about returning from leave. Ultimately, in February 2019, Mr. Lanford was administratively discharged under the state personnel rules because he exhausted all leave. Even at the point of his administrative discharge, he did not express a desire to return to work.

## 4. UNDISPUTED FACTS

The following facts are undisputed:

1. David Lanford was formerly employed as a police officer in the Department of Public Safety at the University of Colorado Colorado Springs.

2. The University of Colorado Colorado Springs ("UCCS") is a campus of the

University of Colorado system located in Colorado Springs.

3.    UCCS receives federal financial assistance.

4.    UCCS is subject to the provisions of the Rehabilitation Act of 1973.

5.    On its website, UCCS touts that: "In accordance with federal and state laws, including but not limited to the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990 (ADA) and the ADA Amendments Act of 2008 (ADAAA), the University prohibits discrimination based on disability in the application process, employment relationship, programs, services, and activities."

6.    The Department of Public Safety at UCCS operates as a police department on the UCCS campus.

7.    Police officers employed by the UCCS Department of Public Safety are granted all the powers conferred by law upon peace officers to carry weapons and make arrests while on the UCCS campus.

8.    On August 19, 2014, UCCS hired Mr. Lanford to work as a police officer.

9.    Mr. Lanford started working for UCCS on September 1, 2014.

10.    Mr. Lanford was an experienced law enforcement officer at the time he went to work for UCCS.

11.    Mr. Lanford was a Colorado P.O.S.T. certified law enforcement officer throughout his employment with UCCS.

12.    In every annual evaluation Mr. Lanford received during his employment, his performance was rated as "meeting expectations."

13.    Mr. Lanford's final performance evaluation, dated February 27, 2019, indicates that his performance was "meeting expectations."

14.    On November 27, 2017, Mr. Lanford was involved in a motor vehicle accident while at work.

15.    The injuries that Mr. Lanford sustained in the accident, and the symptoms caused by those injuries, limited Mr. Lanford's ability to work as a police officer.

16.    After the date of the accident, Mr. Lanford was off work for fourteen days.

17.    Mr. Lanford returned to work in December 2017 under medical restrictions that prevented him from performing some of the normal duties of a police officer.

18.    On February 9, 2018, a workers compensation doctor released Mr. Lanford to return to work for part-time modified duty of ten hours every other day and not more than two days per week.

19.    The February 9, 2018 work restrictions included the restriction that Mr. Lanford perform "sedentary-desk type work only."

20.    On March 22, 2018, Mr. Lanford called Mr. Heidrick to inform him that Mr. Lanford's doctor had released him to return to work for six hours in uniform while working with another officer.

21.    On April 13, 2018, Mr. Lanford gave Mr. Heidrick a note from his doctor stating that Mr. Lanford needed to remain on light duty for another month.

22.    Mr. Heidrick contacted Tiara Lewis, a University workers compensation claims examiner, to inform her he received the note from Mr. Lanford on April 13, 2018.

23.     On June 5, 2018, Mr. Lanford sent an email to Mr. Heidrick that stated: "I'm so tired of not being back to work."

24.     On June 8, 2018, Mr. Lanford sent an email to Mr. Heidrick that stated: "I need to come back."

25.     On June 28, 2018, Mr. Heidrick sent an email to Ms. Lewis asking about Mr. Lanford: "what is the date by with which we can act on his employment?"

26.     On August 7, 2018, Mr. Heidrick sent an email to Anja Wynne, UCCS's Director of Human Resources and ADA Coordinator containing a timeline of Mr. Lanford's "worker's comp activities."

27.     On August 21, 2018, the department's Deputy Chief, Clay Garner, sent an email that stated the following:

> Hi All,
>
> Can we meet again to discuss Dave Lanford's status? I have some concerns about what is not being considered in his case. I'm being informed that to perform an administrative discharge of Lanford we have to exhaust his leave. Since he has or will have used up all of his sick leave in the near future is there no way we can pay out his vacation leave and then discharge him? We could project his vacation accrual based on when he would have out of that if it is an issue. There's nothing that I've read that dictated how he works through his leave for this to apply.
>
> Also, it feels like we're being penalized for being compassionate with Lanford by repeatedly trying to find light duty for him throughout this nine month period thereby saving him the loss of sick leave and/or vacation time. Is there no way to take into account how flexible we've been throughout this process? We cannot afford to wait another 5 to 6 months to replace his position. We are a small department and staffing is always going to be a mission critical concern for us. Is there nothing that can be done here?

Regards,

Clay

28.　As of November 5, 2019, Mr. Lanford's position remained vacant.

29.　Anja Wynne, the ADA Coordinator, received Mr. Garner's August 21, 2018 email.

30.　Ms. Wynne responded to Mr. Garner's email, but her response did not mention the possibility of looking for a reasonable accommodation for Mr. Lanford.

31.　On August 22, 2018, Anja Wynne responded to Mr. Garner's email and confirmed that under State Personnel Board Rule 5-6, Exhaustion of Leave & Administrative Discharge, Mr. Lanford could not be terminated until he used all accrued paid leave.

32.　Ms. Wynne's August 22, 2018 email about using Rule 5-6 to terminate Mr. Lanford did not mention the Rule's proscription on discharging employees with disabilities who can be accommodated.

33.　On November 27, 2018, Mr. Heidrick and Ms. Lewis exchanged emails about Mr. Lanford and when he would potentially be determined to be at maximum medical improvement ("MMI").

34.　On January 23, 2019, Ms. Lewis left a voicemail message for Mr. Heidrick in which she stated that Mr. Lanford's restrictions had not changed and that there was a question about whether Mr. Lanford would be able to return to his job.

35.　Ms. Lewis also stated that it was time for UCCS to look into how much sick and vacation time Mr. Lanford had left so they could calculate it "down to the moment."

36.     On February 28, 2019, Mr. Lanford exhausted all accrued sick and annual leave.

37.     On February 28, 2019, UCCS terminated Mr. Lanford's employment.

38.     Between February 9, 2018 and February 27, 2019, there were at least 388 vacant positions at UCCS.

39.     In addition to the over 400 vacant positions at UCCS from February 9, 2018 through March 29, 2019, there were a number of vacant positions throughout the campus that were generally filled by students on a part-time basis in a work-study capacity.

40.     UCCS claimed that Mr. Lanford's termination was justified under State Personnel Board Rule 5-6.

## 5.  COMPUTATION OF DAMAGES

Mr. Lanford seeks to recover the damages he suffered because of the discrimination he claims he was subjected to by the University. Mr. Lanford seeks to recover the wages, salary, employment benefits, and other compensation he lost by virtue of Defendant's discrimination and the termination of his employment.

Additionally, Mr. Lanford claims compensatory damages in amount to be determined by a jury that are sufficient to compensate him for the humiliation, emotional distress, and insult to his dignity that he suffered as a result of the discrimination he was subjected to by Defendant.

Mr. Lanford seeks pre-judgment interest, and his attorney's fees as allowed by statute.

While employed by UCCS, Mr. Lanford earned $4,573/month ($54,876/year) plus benefits. Mr. Lanford's employment was terminated on February 28, 2019. In the 22 months since his employment was terminated, Mr. Lanford would have earned at $100,606 in wages had

he remained employed by UCCS. It is anticipated that Mr. Lanford would have received pay increases had he remained employed; the value of such increases is not yet known to Mr. Lanford. Mr. Lanford was unemployed for approximately one month after his employment was terminated and lost $4,573 in that one month.

Approximately one month after Mr. Lanford's termination, he secured replacement employment with the Rio Grande County Sheriff's Office ("RGSO"). In 2019, Mr. Lanford earned $27,453; to date in 2020 he has earned approximately $39,681. Mr. Lanford's total earnings with the RGSO are approximately $67,134.

Mr. Lanford's lost wages to date are approximately $38,045. He has also lost the value of pay increases and benefits. The full value of Mr. Lanford's losses, including the value of lost benefits, is not yet known to Mr. Lanford.

A more precise computation of Mr. Lanford's damages, to the extent his damages are subject to such computation, will be provided during the normal course of discovery. At this time, Mr. Lanford cannot provide a complete calculation of the damages he is seeking, as he has not yet had the benefit of conducting full discovery. The damages calculations will be supplemented as necessary during discovery.

Defendant does not seek damages but reserves the right to seek its fees and costs as may be applicable.

## 6. REPORT OF PRECONFERENCE DISCOVERY AND MEETING UNDER FED. R. CIV. P. 26(f)

a.     Date of Rule 26(f) meeting.

The parties held a Rule 26(f) meeting by telephone on December 1, 2020.

10

b.  Names of each participant and party he/she represented.

The Plaintiff was represented by Ian Kalmanowitz.

The Defendant was represented by Erica Weston.

c.  Statement as to when Rule 26(a)(1) disclosures were made or will be made.

The parties will make their initial disclosures on or before December 15, 2020.

d.  Proposed changes, if any, in timing or requirement of disclosures under Fed. R. Civ. P. 26(a)(1).

The parties will make their initial disclosures on or before December 15, 2020.

e.  Statement concerning any agreements to conduct informal discovery:

None.

f.  Statement concerning any other agreements or procedures to reduce discovery and other litigation costs, including the use of a unified exhibit numbering system.

The parties have discussed the use of a unified exhibit numbering system for trial exhibits and will comply with the appropriate practice standard for trial exhibits. The parties have agreed that they will use one set of exhibits with a unified exhibit numbering system for deposition exhibits. The parties do not anticipate any disputes regarding the disclosure or discovery of Electronically Stored Information ("ESI") at this time. The parties agree that documents will be produced initially in either paper or portable document format (".pdf"), and that if issues arise that cause a party to believe that it needs a particular document or set of documents in another format, including native format, that party will request production in such format. The parties will attempt in good faith to resolve the request bearing in mind the provisions of Fed. R. Civ. P. 26 involving ESI. If a dispute develops the parties will involve the

Court only if necessary using the Court's practice standards. For efficiency, the parties agree

that they will produce documents electronically in .pdf format by either CD, DVD, email, flash

drive, or secure FTP network. The parties agree to produce all disclosure documents and all

discovery documents with their respective disclosures and discovery responses and agree to use

email and secure FTP network as the primary and preferred means of transmittal whenever

possible. Defendant agrees to make its current employees for whom there is no objection to a

deposition occurring available for depositions at a location in the area of their principal place of

business without being subpoenaed to appear. As necessary to comply with any public health

orders, social distancing requirements, or to accommodate the needs or health concerns of any

participant, the parties agree to conduct depositions remotely by audio-video conferencing or

other remote means.

g.    Statement as to whether the parties anticipate that their claims or defenses will involve extensive electronically stored information, or that a substantial amount of disclosure or discovery will involve information or records maintained in electronic form.

The parties do not anticipate that their claims or defenses will involve extensive ESI, or

that a substantial amount of disclosure or discovery will involve information or records

maintained in electronic form. However, the parties anticipate that their claims or defenses may

involve the following categories of ESI: emails, and word-processed documents in their native

format. See also above in section (f).

h.    Statement summarizing the parties' discussions regarding the possibilities for promptly settling or resolving the case.

The parties have discussed the possibility for settling this case and will continue to

explore resolution through settlement.

## 7. CONSENT

All parties *have not* consented to the exercise of jurisdiction of a magistrate judge.

## 8. DISCOVERY LIMITATIONS

a. Modifications which any party proposes to the presumptive numbers of depositions or interrogatories contained in the Federal Rules.

Ten depositions per side, excluding depositions of expert witnesses. No modification to the presumptive limit of 25 interrogatories per side.

b. Limitations which any party proposes on the length of depositions.

No deposition of any deponent may exceed 7 hours without leave of court or agreement of the parties.

c. Limitations which any party proposes on the number of requests for production and/or requests for admission

25 requests for production of documents per side; 25 requests for admission per side.

d. Deadline for service of Interrogatories, Requests for Production of Documents and/or Admissions:

Interrogatories, Requests for Production of Documents, and/or Requests for Admission must be served no later than 40 days before the deadline for completion of discovery in effect at the time of service.

e. Other Planning or Discovery Orders

*Disclosures*

The parties will produce copies of all documents and electronically stored information designated pursuant to Fed. R. Civ. P. 26(a)(1)(A)(ii) to the office of opposing counsel at the time the parties make their initial disclosures or any supplemental disclosures or as soon thereafter as

practicable, not to exceed three days after the service of any disclosure. Because the parties will produce copies of documents and electronically stored information with their disclosures, no Rule 34 request for production of documents will be required to obtain documents or electronically stored information identified in a party's Rule 26(a)(1) or 26(e) disclosures.

*Production of Documents*

The parties will produce documents and electronically stored information responsive to Rule 34 requests for production to the office of the requesting party on the date the responses to the Rule 34 requests for production are made or as soon thereafter as practicable, not to exceed three days after the service of any response to a Rule 34 request for production. The responses to the Rule 34 requests for production will designate by Bates number or other identifying label the specific documents that are responsive to each request. If materials responsive to a Rule 34 request for production are withheld due to an objection based on attorney client privilege, the objecting party will produce with its responses to the requests a log identifying the withheld materials that states the objection to producing each identified document.

*Subpoenas*

The parties agree to confer in good faith prior to the issuance of any third-party subpoenas for production of documents or tangible things. Before service of such a third-party subpoena, a party will provide notice and a copy of the subpoena to the other party and allow no fewer than five (5) business days before the subpoena is served on the third party to allow for the parties to confer over any disputes about the subpoena. The parties agree to produce all documents received in response to a third party subpoena to the other party as possible, but in

any event no later than three days after receipt of the documents.

## 9. CASE PLAN AND SCHEDULE

a.      Deadline for Joinder of Parties and Amendment of Pleadings:

December 29, 2020.

b.      Discovery Cut-off:

July 12, 2021.

c.      Dispositive Motion Deadline:

August 23, 2021

d.      Expert Witness Disclosure

1.      The parties shall identify anticipated fields of expert testimony, if any.

Plaintiff: Plaintiff anticipates the need for expert testimony in the following fields:

damages and disability.

Defendant: Defendant anticipates the need for rebuttal experts to rebut opinions

expressed by Plaintiff's affirmative experts.

2.      Limitations which the parties propose on the use or number of expert
        witnesses.

Two per side, not including treating physicians, without leave of Court.

3.      The parties shall designate all experts and provide opposing counsel and any
        pro se parties with all information specified in Fed. R. Civ. P. 26(a)(2) on or
        before May 7, 2020.

4.      The parties shall designate all rebuttal experts and provide opposing counsel
        and any pro se party with all information specified in Fed. R. Civ. P. 26(a)(2)
        on or before June 7, 2020.

e.      Identification of Persons to Be Deposed:

15

Plaintiff: Jerrod Heidrick, Tiara Lewis, Anja Wynne, Marc Pino, Rule 30(b)(6), TBD.

Defendant: Plaintiff, TBD.

## 10.  DATES FOR FURTHER CONFERENCES

*[The magistrate judge will complete this section at the scheduling conference if he or she has not already set deadlines by an order filed before the conference.]*

a.    Status conferences will be held in this case at the following dates and times:

_____.

b.    Dates for a Final Pretrial Conference, Trial Preparation Conference and Trial will be set by the District Court on separate order. Please see Judge Domenico's Civil Practice Standards Section IV.A.1.

## 11.  OTHER SCHEDULING MATTERS

a.    Identify those discovery or scheduling issues, if any, on which counsel after a good faith effort, were unable to reach an agreement.

b.    Anticipated length of trial and whether trial is to the court or jury.

The parties anticipate a five-day trial to a jury.

c.    Identify pretrial proceedings, if any, that the parties believe may be more efficiently or economically conducted in the District Court's facilities at 212 N. Wahsatch Street, Colorado Springs, Colorado 80903-3476; Wayne Aspinall U.S. Courthouse/Federal Building, 402 Rood Avenue, Grand Junction, Colorado 81501-2520; or the U.S. Courthouse/Federal Building, La Plata County Courthouse, 1060 E. 2nd Avenue, Suite 150, Durango, Colorado 81301.

As Magistrate Judge Tafoya is located in the Court's facilities in Colorado Springs, it

would be appropriate to conduct any pretrial proceedings that are referred to her by Judge

Domenico in the Colorado Springs Courtroom.

## 12.  NOTICE TO COUNSEL AND PRO SE PARTIES

The parties filing motions for extension of time or continuances must comply with

16

D.C.COLO.LCivR 6.1(c) by serving the motion contemporaneously upon the moving attorney's client.

Counsel will be expected to be familiar and to comply with the Pretrial and Trial Procedures or Practice Standards established by the judicial officer presiding over the trial of this case.

With respect to discovery disputes, parties must comply with D.C.COLO.LCivR 7.1(a).

Counsel and unrepresented parties are reminded that any change of contact information must be reported and filed with the Court pursuant to the applicable local rule.

### 13. AMENDMENTS TO SCHEDULING ORDER

The scheduling order may be altered or amended only upon a showing of good cause.

DATED at Denver, Colorado, this 21st day of December, 2020.

BY THE COURT:

United States Magistrate Judge